**No. 23-1024**

# In the United States Court of Appeals for the Seventh Circuit

---

B.D., A MINOR, BY AND THROUGH HIS GUARDIAN AD LITEM, BRYAN MEYERS,
*Plaintiff-Appellee,*

v.

SAMSUNG SDI CO., LTD.,
*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Southern District of Indiana
Case No. 2:22-cv-00107 (The Hon. James R. Sweeney)

---

## BRIEF OF PLAINTIFF-APPELLEE

---

ALISA TIWARI
JONATHAN E. TAYLOR
GUPTA WESSLER PLLC
2001 K Street NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
*alisa@guptawessler.com*

May 8, 2023          *Counsel for Plaintiff-Appellee*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-1024

Short Caption: B.D. v. Samsung SDI Co., Ltd.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

□    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

B.D. a minor, by and through his guardian ad litem, Bryan Meyers

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Levin Simes LLP, Gupta Wessler PLLC, Hovde Dassow + Deets, LLC

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

N/A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Alisa Tiwari    Date: 5/8/23

Attorney's Printed Name: Alisa Tiwari

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes □    No ☑

Address: 2001 K Street NW, Suite 850 North

Washington, DC 20006

Phone Number: 202-888-1741    Fax Number: 202-888-7792

E-Mail Address: alisa@guptawessler.com

rev. 12/19 AK

# TABLE OF CONTENTS

Table of authorities ................................................................ iii

Introduction ........................................................................... 1

Jurisdictional statement .........................................................5

Statement of the issue ...........................................................5

Statement of the case ............................................................5

    A.   Samsung's lithium-ion batteries, and 18650 batteries in particular, are ubiquitous throughout the United States, including in Indiana .........5

    B.   The use of Samsung's lithium-ion batteries results in serious injuries for many consumers ....................................................7

    C.   Minor B.D. suffers serious injuries after a Samsung battery explodes ................................................................. 10

Summary of argument ......................................................... 13

Argument .............................................................................15

    I.   Because Samsung serves a market for lithium-ion batteries in Indiana and a lithium-ion battery injured one of the state's residents in Indiana, Indiana courts may entertain this suit ...................15

        A.   Samsung purposefully availed itself of the privilege of conducting business in Indiana .................................... 16

            1.   Samsung has served the Indiana market by intentionally disseminating its 18650 batteries in Indiana through the stream of commerce ............................................17

            2.   Samsung has served Indiana's market by shipping over 500,000 pounds of lithium-ion batteries to an Indiana business ................................................................21

        B.   B.D.'s injuries arise out of or relate to Samsung's contacts with the state ..............................................................22

1.    At a minimum, this lawsuit "relates to" Samsung's
purposeful availment of the 18650-lithium-ion-battery
market in Indiana ................................................................. 22

2.    Samsung's lithium-ion battery shipments to an Indiana
company relate to this litigation ............................................ 25

II.  Samsung's two objections to personal jurisdiction both fail................... 26

A.  Samsung's argument that it has "no contacts" with Indiana
ignores this Court's stream-of-commerce precedents.................. 27

B.  Samsung's attempt to avoid *Ford*'s rule based on how the
consumer used the product in the state has no legal support ....... 33

III. In the alternative, B.D. is entitled to jurisdictional discovery ................ 38

Conclusion ........................................................................................... 39

# TABLE OF AUTHORITIES

## Cases

*Berven v. LG Chem, Ltd.*,
  2019 WL 1746083 (E.D. Cal. April 18, 2019) .............................................. 33

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985) ......................................................................... 16

*Central States, Southeast & Southwest Areas Pension Fund v. Phencorp
  Reinsurance Co.*,
  440 F.3d 870 (7th Cir. 2006) .............................................................. 38

*Central States, Southeast & Southwest Areas Pension Fund v. Reimer Express
  World Corp.*,
  230 F.3d 934 (7th Cir. 2000) ......................................................... 15, 38

*Cincinnati Insurance Co. v. LG Chem America, Inc.*,
  2021 WL 4864231 (S.D. Ill. Oct. 19, 2021) ............................................... 9

*Curry v. Revolution Laboraties, LLC*,
  949 F.3d 385 (7th Cir. 2020) ..................................................... 11, 27, 32

*Dehmlow v. Austin Fireworks*,
  963 F.2d 941 (7th Cir. 1992) ................................................. 18, 27, 28, 32

*Dilworth v. LG Chem, Ltd.*,
  355 So. 3d 201 (Miss. 2022) ........................................................ *passim*

*Ford Motor Co. v. Montana Eighth Judicial District Court*,
  141 S.Ct. 1017 (2021) .............................................................. *passim*

*Giotis v. Apollo of the Ozarks, Inc.*,
  800 F.2d 660 (7th Cir. 1986) ..................................................... 14, 18, 28

*Gray v. American Radiator & Standard Sanitary Corp.*,
  22 Ill. 2d 432 (1961) ...................................................................... 28

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
  466 U.S. 408 (1984) ...................................................................... 35

*J. McIntyre Machinery, Ltd. v. Nicastro*,
  564 U.S. 873 (2011) ............................................................. 20, 28, 29

*J.S.T. Corp. v. Foxconn Interconnect Technology Ltd.*,
   965 F.3d 571 (7th Cir. 2020) ................................................................*passim*

*Jennings v. AC Hydraulic A/S*,
   383 F.3d 546 (7th Cir. 2004) ............................................................*passim*

*Keeton v. Hustler Magazine, Inc.*,
   465 U.S. 770 (1984) ....................................................................................17

*LG Chem Am., Inc. v. Morgan*,
   2020 WL 7349483 (Tex. App. Dec. 15, 2020) ................................ 24, 33

*LG Chem, Ltd. v. Lemmerman*,
   361 Ga. App. 163 (2021) ........................................................... 24, 33

*Lorenzen v. Toshiba American Information Systems, Inc.*,
   569 F. Supp. 3d 109 (D.R.I. 2021) ..................................................... 9, 20

*Mason v. F. LLI Luigi & Franco Dal Maschio Fu G.B. s.n.c.*,
   832 F.2d 383 (7th Cir. 1987) .............................................................. 28

*Montoya v. Samsung SDI Co.*,
   2022 WL 18776009 (S.D. Ga. Dec. 28, 2022) ........................................ 9

*Nelson by Carson v. Park Industries, Inc.*,
   717 F.2d 1120 (7th Cir. 1983) .................................................. 14, 18, 28

*Philos Technologies, Inc. v. Philos & D, Inc.*,
   802 F.3d 905 (7th Cir. 2015) ......................................................... 15, 38, 39

*Purdue Research Foundation v. Sanofi-Synthelabo, S.A.*,
   338 F.3d 773 (7th Cir. 2003) ............................................................ 32

*Shelter Mutual Insurance Co. v. Bissell Homecare, Inc.*,
   2021 WL 1663585 (M.D. Tenn. Apr. 28, 2021) ..................................... 9

*Sullivan v. LG Chem, Ltd.*,
   2022 WL 452501 (E.D. Mich. Feb. 14, 2022) ....................................... 33

*Tieszen v. EBay, Inc.*,
   2021 WL 4134352 (D.S.D. Sept. 10, 2021) ......................................... 33

*Turnock v. Cope*,
    816 F.2d 332 (7th Cir. 1987) ..................................................................... 19

*Walden v. Fiore*,
    571 U.S. 277 (2014) .......................................................................... 4, 35

*Williams v. LG Chem, Ltd.*,
    2022 WL 873366 (E.D. Mo. Mar. 24, 2022) ......................................... 33

*World-Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286 (1980) ............................................................... 4, 14, 16, 17

## Other Authorities

Industry Research,
    GlobeNewswire (Feb. 14, 2022) ................................................................8

U.S. Fire Administration,
    *Electronic Cigarette Fires & Explosions* (Oct. 2014) ....................................8

U.S. Fire Administration,
    *Electronic Cigarette Fires and Explosions in the United States 2009-2016*
    (July 2017) ............................................................................................8

Vicky Nguyen,
    *An exploding problem: Fires sparked by lithium batteries are confounding*
    *firefighters*, NBC News (Feb. 7, 2023) ......................................................9

## INTRODUCTION

In 2019, an Indiana resident purchased a Samsung lithium-ion battery from a store in Indiana, and he gave it to his stepson, another Indiana resident named B.D. The battery provided no warning of a risk of explosion, even though that risk was well known to Samsung. And the risk later materialized—the battery exploded in B.D.'s pocket while he was at his home in Indiana, causing him severe burns.

B.D. turned to the courts. He sued exactly where one would expect: Indiana. And he sued exactly who one would expect: Samsung—one of the world's leading manufacturers of lithium-ion batteries, including the model that injured B.D. (18650 batteries), which can be found in countless stores and household items in Indiana.

Samsung contends that Indiana courts nevertheless lack personal jurisdiction over the company. But as the district court recognized, personal jurisdiction is proper under a straightforward application of the U.S. Supreme Court's recent decision in *Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017 (2021). *Ford*'s holding is simple: So long as a company "serves a market for a product in a State and that product causes injury in the State to one of its residents, the State's courts may entertain the resulting suit." *Id.* at 1022. That rule squarely applies here.

Samsung "serves a market" for lithium-ion batteries in Indiana in two different ways. First, B.D. has shown that Samsung serves Indiana's market directly, by sending hundreds of thousands of pounds of its lithium-ion batteries to Indiana

companies for use in power grids that provide electricity for Indiana residents. And second, B.D. alleges that Samsung serves Indiana's market indirectly, by selling millions of its 18650 batteries to intermediaries with the intent and knowledge that many reach Indiana—which is exactly what happens. Samsung does not deny this allegation or dispute any of the evidence supporting it. To the contrary, Samsung all but admits a business strategy of disseminating batteries to Indiana—either through intermediaries that it understood would distribute them to Indiana, or as component parts in consumer products widely available for purchase in Indiana. That is more than enough to establish purposeful availment under this Court's stream-of-commerce precedents. Because, as the district court explained, Samsung causes its 18650 batteries to "get to Indiana" "on a large scale," the alleged facts show a "continuous and deliberate exploitation of the Indiana market." App. 35.

The second half of the *Ford* rule—that the "product causes injury in the State to one of its residents"—is also easily met. *See* 141 S. Ct. at 1022. An Indiana resident bought a Samsung lithium-ion battery in Indiana and was injured by it in Indiana. Under a straightforward application of *Ford*, then, Indiana courts may entertain this suit, as the district court correctly recognized.

The Mississippi Supreme Court recently reached the same conclusion with respect to another leading lithium-ion-battery producer (LG Chem). "Given LG Chem's effort to serve (directly or indirectly) the market for lithium-ion batteries in

Mississippi," the court explained, "the availability for sale in Mississippi of the battery that injured [the plaintiff] was related to LG Chem's activities in the state and was not a random, isolated, or fortuitous occurrence." *Dilworth v. LG Chem, Ltd.*, 355 So. 3d 201, 207 (Miss. 2022). "And significantly," the court continued, "LG Chem did not controvert the allegations of the complaint that it placed its product into the stream of commerce with the expectation that it would be sold in Mississippi." *Id.* Swap in Samsung, B.D., and Indiana, and you have this case.

None of Samsung's arguments to the contrary are persuasive. Samsung asserts that its direct sales to Indiana are irrelevant because they involved "wholly unrelated products"—meaning, a different model of lithium-ion battery. But Samsung has never articulated how the lithium-ion batteries in those sales differ from the batteries in this case, much less explain why any difference should matter for jurisdictional purposes. If anything, it has done the opposite: It represented in other litigation that all lithium-ion batteries present the same risk of explosion, while submitting evidence in this case indicating that they are indistinguishable in every relevant sense.

Samsung also claims that it has "no contacts whatsoever" with Indiana, because it made no direct sales of 18650 batteries to anyone in the state and has no office there. But this argument is really just an attack on the stream-of-commerce theory of jurisdiction that this Court has consistently applied in products-liability cases for decades. "The stream of commerce theory contemplates that a defendant's

3

product may go through middlemen before reaching consumers," *J.S.T. Corp. v. Foxconn Interconnect Tech. Ltd.*, 965 F.3d 571, 576 (7th Cir. 2020), and allows for jurisdiction if a company "delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State," *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 298 (1980). Thus, this Court had repeatedly held that companies without in-state sales, marketing, or physical presence can be subject to jurisdiction. Samsung ignores these cases entirely.

Finally, Samsung opposes jurisdiction because B.D. bought the battery for use in an e-cigarette device. It argues that, even if it serves a market for lithium-ion batteries in Indiana, it doesn't serve a market for "individual use by consumers" or for "e-cigarettes applications" so *Ford* is inapplicable. But *Ford* requires only that Samsung "serve[] a market" for the product at issue, which Samsung does. 141 S. Ct. at 1022. There is no basis for creating a new exception to that rule depending on how a consumer uses the product, or how the defendant might try to redefine the market. Not in *Ford*, which rejected similar attempts to parse the forum state's market. And not in other cases, which make clear that the relationship between the defendant and the forum—and not the plaintiff's actions—is the focus of the minimum-contacts inquiry. *See, e.g.*, *Walden v. Fiore*, 571 U.S. 277 (2014).

In short, this Court should apply the rule announced in *Ford*, follow its stream-of-commerce precedents, and affirm the district court's thoughtful decision.

## JURISDICTIONAL STATEMENT

The jurisdictional summary in the appellant's brief is complete and correct.

## STATEMENT OF THE ISSUE

Does the Due Process Clause of the Fourteenth Amendment preclude Indiana courts from exercising personal jurisdiction over a company that systematically serves a market for a product in Indiana—both by intentionally having its product incorporated into consumer goods widely available in Indiana and by directly selling its product into the state—when an Indiana resident is injured by that product in the state?

## STATEMENT OF THE CASE

### A. Samsung's lithium-ion batteries, and 18650 batteries in particular, are ubiquitous throughout the United States, including in Indiana.

These days, you'd be hard-pressed to find a household that doesn't have Samsung's lithium-ion batteries. They're in the closet—in flashlights and Black & Decker appliances. Supp. App. (SA) 151. They're in the toolshed—in drills and other power tools by Westinghouse, Bosch, Oregon Tools, and Milwaukee Tools. SA 133, 141, 143, 150; *see* SA 129. And they're in the garage—in leaf blowers, power bikes, scooters, golf carts, and electronic vehicles. SA 132, 157, 159, 244, 246, 248, 250. In fact, so dominant are these name-brand batteries that companies often choose to emphasize the incorporation of a "Lithium-Ion battery system powered by Samsung

SDI" to better market their electronic goods to consumers. SA 131, 133–140. The batteries are, to put it simply, everywhere.

Indiana is no exception. Samsung sells millions of lithium-ion batteries across the United States, knowing full well that many of them reach Indiana consumers. Samsung contracts with large companies to ensure that its batteries are incorporated into various commonplace goods available for purchase at Lowes, Home Depot, and other power-tool stores throughout the state. SA 131, 132, 146, 153, 155. Its lithium-ion batteries are also sold as standalone products by numerous Indiana retailers, like vape shops. *See* ECF No. 16 at 5. And if a replacement is necessary, one can easily be found at Walmart. SA 123.

Many of these batteries make their way into Indiana through various chains of distribution, with Samsung first selling them to intermediaries outside the state. But sometimes, Samsung sells batteries directly to Indiana companies. In 2015, for instance, Samsung shipped over half a million pounds of lithium-ion batteries to Indianapolis Power & Light Company to help power the first grid-scale, battery-based energy storage system in the region. *See* SA 30–34, 117–19. This system is designed to ensure that Indiana residents have a reliable source of power by storing renewable energy, and "features" Samsung's lithium-ion battery technology in doing so. SA 117–19. Another company quickly followed suit, commissioning two clean-energy-powered storage systems to operate as microgrids, and likewise relying on

6

Samsung lithium-ion batteries to provide energy during times of peak demand. This company "worked very closely with . . . Samsung [] to rightsize the battery to account for the demanding duty cycle associated with such services," and described the endeavor as a "collaborative effort." SA 121. As a result of these efforts, Samsung's lithium-ion batteries are now used by innumerable Indiana residents for their everyday electricity needs.

## B. The use of Samsung's lithium-ion batteries results in serious injuries for many consumers.

At issue in this case is one particular model of Samsung lithium-ion battery: 18650s. 18650 batteries look a lot like standard AA batteries. They are versatile and interchangeable, with the "18" and "65" referring to the width and height of the battery in millimeters. But unlike standard AA batteries, these lithium-ion batteries are rechargeable and hold a considerable amount of energy. SA 44. They are also highly flammable, and yet lack safety features to prevent their catching fire. Thus, they are not safe to use in devices that may expose them to high temperatures, such as e-cigarettes, which require battery power to vaporize liquid infused with nicotine. SA 47. Such devices, when used with an 18650, carry the risk of sparking and eventually exploding. *See* SA 48–51.

This risk has been well documented for years. Almost a decade ago, the U.S. Fire Administration (a division of FEMA) reported on numerous fires caused by e-cigarettes, including several serious burn injuries. *See* U.S. Fire Administration,

*Electronic Cigarette Fires & Explosions*, at 3 (Oct. 2014), https://perma.cc/3JSY-4477. A few years later, in 2017, the Fire Administration issued an updated report finding that "the combination of an electronic cigarette and a lithium-ion battery is a new and unique hazard" that presents a "risk of a severe, acute injury" with "no analogy among consumer products." U.S. Fire Administration, *Electronic Cigarette Fires and Explosions in the United States 2009-2016*, at 1 (July 2017), https://perma.cc/H2DX-P8GX. The Administration expressed particular concern about the numerous reports of batteries exploding in people's pockets, which risked "severe," "devastating," and "life-altering" injuries. *Id.* at 1, 5–7, 11.

Samsung admits that its 18650 lithium-ion batteries are not safe in certain devices, including e-cigarettes, because they carry the risk of igniting, catching fire, or explosion. SA 48–51. Yet Samsung has sold these batteries by the millions—with many ultimately destined for Indiana. And its sales have only risen in recent years: Samsung sold over 14 million 18650 batteries in 2015. Two years later, it sold more than four times that amount (63.7 million). SA 107–15. All told, Samsung and two other companies now control nearly 80 percent of the $63-billion global market for 18650 batteries. *See* Industry Research, GlobeNewswire (Feb. 14, 2022), https://perma.cc/AQF4- DHB8.

The sharp increase in Samsung's 18650 sales has prompted an equally sharp increase in litigation. As of last year, Samsung had been named as a defendant in at

8

least 88 other lawsuits stemming from injuries caused by its lithium-ion batteries. SA 107–15. These lawsuits have been filed across the country, including in Indiana. *Id.* And they could hardly have come as a surprise to Samsung: By January 2016 at the latest, Samsung knew that its 18650 batteries had been exploding in e-cigarettes. SA 47. But it did not add safety features that prevented them from catching fire. And it took Samsung until August 2019 to place a warning on the batteries stating that they should be not used with e-cigarettes. SA 101.

Most lithium-ion-battery lawsuits involve 18650s and e-cigarettes. But not all of them: Because there is an explosion risk with all lithium-ion batteries, SA 49–51, many lawsuits have involved other batteries of different shapes and sizes, used in devices ranging from laptops to vacuums. *See, e.g., Lorenzen v. Toshiba Am. Info. Sys., Inc.,* 569 F. Supp. 3d 109, 112 (D.R.I. 2021) (laptop); *Montoya v. Samsung SDI Co.,* 2022 WL 18776009, at *1 (S.D. Ga. Dec. 28, 2022) (flashlight); *Cincinnati Ins. Co. v. LG Chem Am., Inc.,* 2021 WL 4864231, at *1 (S.D. Ill. Oct. 19, 2021) (saw); *Shelter Mut. Ins. Co. v. Bissell Homecare, Inc.,* 2021 WL 1663585, at *1 (M.D. Tenn. Apr. 28, 2021) (vacuum); *see Gopalratnam v. Hewlett-Packard Co.,* 877 F.3d 771, 775 (7th Cir. 2017). There have also been reports of lithium-ion-battery explosions at power grids. *See, e.g.,* Vicky Nguyen, *An exploding problem: Fires sparked by lithium batteries are confounding firefighters,* NBC News (Feb. 7, 2023), https://perma.cc/WXN7-WCNP. In short, lithium-ion batteries are pervasive, and they've caused injuries to countless people through sudden explosions.

## C.  Minor B.D. suffers serious injuries after a Samsung battery explodes.

This case involves one of them. In September 2019, Bryan Myers bought an 18650 battery at an e-cigarette store in Vincennes, Indiana. SA 1–2. The battery did not have a warning saying it should not be used in e-cigarettes. After Mr. Myers purchased the battery, his stepson—an Indiana resident and minor named B.D.— had the battery in his pocket when it spontaneously exploded and caught on fire, severely injuring him. B.D.'s grandfather rushed him to the hospital, where he remained in the burn unit for three weeks. SA 1, 10.

Having suffered serious injuries from its defective battery, B.D. sued Samsung. Because he is an Indiana resident who was injured in Indiana by a product purchased in Indiana, he sued in Indiana state court. Samsung then removed to federal court and filed a motion to dismiss for lack of personal jurisdiction. *See* ECF Nos. 8 & 9.

In its motion, Samsung did not deny that large quantities of its 18650s are sold in Indiana, and that it has "derived substantial revenue from the sale of [these] products in the State of Indiana." SA 6. Nor did Samsung deny that it has sold its 18650 batteries to U.S.-based companies "with the intent and knowledge that [they] would reach and be used by Indiana residents and consumers," *id.*, either through intermediaries that Samsung understood would pack the batteries and then distribute them to Indiana, or as component parts in power tools and other finished consumer products "widely available for purchase throughout Indiana," ECF No. 16

10

at 5–6. To the contrary, Samsung admitted that it sells its 18650 batteries in "bulk" to companies that "assemble the cells into battery packs for subsequent sale and distribution" to Indiana and other states. ECF No. 9 at 1. It also admitted that it sells its 18650 batteries in "bulk" to companies that then incorporate them into finished products that are sold to consumers in Indiana and other states. *Id.* at 2.

But Samsung argued that Indiana courts lack personal jurisdiction over it because, the company claimed, it didn't ship 18650 batteries *directly* to Indiana, or sell them *directly* to an Indiana distributor. Samsung also argued that it didn't sell the batteries as standalone products directly to consumers for use in e-cigarettes. ECF No. 9 at 2.

The district court denied Samsung's motion to dismiss for lack of personal jurisdiction. Even if Samsung didn't sell its 18650 batteries directly to Indiana, the district court explained, this Court has long permitted use of "the stream of commerce theory" as a basis for establishing personal jurisdiction. App. 33 (quoting *Jennings v. AC Hydraulic A/S*, 383 F.3d 546, 550 & n.2 (7th Cir. 2004)). And "[t]he stream of commerce theory applies squarely to cases in which a company doing nation-wide business is sued in some part of its national market for its product's defects." *Id.* Under that precedent, "[t]here is no per se requirement that the defendant especially target the forum in its business activity; it is sufficient that the defendant reasonably could foresee that its product would be sold in the forum." *Id.* at 6 (quoting *Curry v.*

*Revolution Labs., LLC*, 949 F.3d 385, 399–400 (7th Cir. 2020)). The district court applied that rule to this record and concluded that jurisdiction is proper because "Samsung sells tens of millions of 18650 batteries each year," with "some of these millions [being] readily available in Indiana, both as standalone batteries and in battery packs," and "the battery in question was purchased at retail in Indiana." *Id.* at 7. Having found jurisdiction on that ground, the court had no need to consider Samsung's direct sales of other lithium-ion-batteries for use in Indiana.

The court rejected Samsung's defenses that it cannot know where or how its batteries end up being used downstream of its business-to-business sales in certain states. "[R]egardless of how Samsung structures its business," the court explained, "its batteries do get to Indiana—and not occasionally or at random, but on a large scale." App. 35. And that's because Samsung is a "multinational business that directly and indirectly sells as many batteries to the United States as it can." App. 36. Thus, "Samsung must know that its batteries are ubiquitous in the United States, including Indiana*." Id.* That B.D. purportedly misused the battery was irrelevant, because "[i]f Samsung is serving . . . the Indiana market, it has established minimum contacts that make it amendable to suit, regardless of whether the behavior that eventually gives rise to the suit is at all reasonable or foreseeable." App. 36–37.

## SUMMARY OF ARGUMENT

**I.A.** This appeal can be resolved under a straightforward application of the Supreme Court's rule in *Ford*. That rule is clear: So long as a company "serves a market for a product in a State and that product causes injury in the State to one of its residents, the State's courts may entertain the resulting suit." 141 S. Ct. at 1022.

Its application to this case is also clear. B.D. has alleged that Samsung serves a market for lithium-ion batteries (and 18650s in particular) in Indiana through the stream of commerce, and he has provided evidence in support. He has also shown that Samsung directly sold over half a million pounds of lithium-ion batteries to Indiana companies for use in power grids. Samsung does not deny that it sells lithium-ion batteries, including 18650s, to companies with the intent and knowledge that they reach Indiana. Nor does it deny that "its batteries do get to Indiana—and not occasionally or at random, but on a large scale." App. 35. And while it asserts (at 23) that its direct Indiana sales involve "wholly unrelated products," it does not meaningfully dispute B.D.'s evidence to the contrary, let alone provide evidence or reasoning of its own for why those batteries are different for jurisdictional purposes. The first half of *Ford*'s test is thus easily met.

**B.** The second half of *Ford's* test is also easily met. A Samsung 18650 battery caused an injury in Indiana to B.D.—an Indiana resident. Accordingly, as numerous courts have held, jurisdiction follows. *See, e.g., Dilworth*, 355 So. 3d at 209.

13

**II.** Samsung makes only two arguments in response, but neither is availing.

**A.** First, Samsung contends that it has "no contacts whatsoever" with Indiana because it did not sell 18650 batteries directly to Indiana or have an office there. But, as this Court has repeatedly held, the stream-of-commerce theory permits jurisdiction in exactly that scenario. The "theory contemplates that a defendant's product may go through middlemen before reaching consumers," *J.S.T. Corp.*, 965 F.3d at 576, and allows for jurisdiction if "a corporation [] delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State," *World-Wide Volkswagen*, 444 U.S. at 298; *see Giotis v. Apollo of the Ozarks, Inc.*, 800 F.2d 660, 667 (7th Cir. 1986); *Nelson by Carson v. Park Indus., Inc.*, 717 F.2d 1120, 1126 (7th Cir. 1983).

**B.** Second, Samsung argues that jurisdiction is improper because B.D. got the battery in a way that it does not authorize: as a standalone battery at an e-cigarette store. It argues (at 15) that, even if it serves a market for lithium-ion batteries in Indiana, it doesn't serve a "market for individual use by consumers" in e-cigarettes, so *Ford* is inapplicable. But *Ford* requires only that the defendant "serve[] a market" for the product at issue in the forum state. 141 S. Ct. at 1022. It does not require the defendant to serve consumers directly or to work with the business that sold the plaintiff the product. *Id.* And how the plaintiff used the product should not be the

focus of the jurisdictional inquiry. It is the defendant's actions—not the plaintiff's—that should drive the outcome of the minimum-contacts inquiry.

**III.** If this Court has doubts about whether jurisdiction is proper, it should remand to the district court so B.D. can develop a record through jurisdictional discovery. B.D. has made "prima facie showing of personal jurisdiction" under two independent theories. *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 946 (7th Cir. 2000). But to the extent the Court declines to credit his allegations about Samsung's business strategy, or finds that "material facts about personal jurisdiction are in dispute," *Philos Technologies, Inc. v. Philos & D, Inc.*, 802 F.3d 905, 912 (7th Cir. 2015), he should be permitted to seek corroboration through discovery.

## ARGUMENT

**I.   Because Samsung serves a market for lithium-ion batteries in Indiana and a lithium-ion battery injured one of the state's residents in Indiana, Indiana courts may entertain this suit.**

The question in this appeal is whether Indiana courts may exercise specific personal jurisdiction over Samsung consistent with due process. In contrast with general personal jurisdiction, under which a defendant may be sued for "any and all claims," specific personal jurisdiction looks to the "relationship among the defendant, the forum, and the litigation." *Ford*, 141 S. Ct. at 1024, 1028.

For specific jurisdiction to comport with due process, three requirements—known as the minimum-contacts test—must be satisfied. *First*, the defendant must purposefully avail "itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King v. Rudzewicz*, 471 U.S. 462, 475 (1985). *Second*, the suit "must arise out of or relate to the defendant's contacts" with the forum state. *Ford*, 141 S. Ct. at 1025. *Third*, the exercise of jurisdiction must be reasonable and comport with "notions of fair play and substantial justice." *World-Wide Volkswagen*, 444 U.S. at 292. Because Samsung has never denied that exercising jurisdiction would be reasonable here, we address only the first two requirements—both of which are satisfied under binding precedent.

### A.    Samsung purposefully availed itself of the privilege of conducting business in Indiana.

The first requirement (purposeful availment) focuses on the defendant's contacts with the forum state, which "can appear in different guises." *Curry*, 949 F.3d at 398 (quotation marks omitted). To count, the "contacts must be the defendant's own choice and not 'random, isolated, or fortuitous.'" *Ford*, 141 S. Ct. at 1025. A nonresident defendant's contacts are sufficient when it engages in activity directed toward the forum state. *Id.* at 1024.

The caselaw makes clear that a variety of activities can provide the requisite contacts. For example, marketing a product in a state is sufficient. *Id.* at 1038 (identifying advertising in local media as a classic example of purposeful availment).

But a manufacturer also forms the requisite contacts with a state when it places its products "into the stream of commerce with the expectation that they will be purchased by consumers in the forum State," *World-Wide Volkswagen*, 444 U.S. at 298, or sells its products directly into the state, *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984).

Here, Samsung did both. It knowingly and intentionally disseminated large quantities of its 18650 batteries in Indiana through the stream of commerce. And it sold over half a million pounds of lithium-ion batteries directly to Indiana customers.

> **1.  Samsung has served the Indiana market by intentionally disseminating its 18650 batteries in Indiana through the stream of commerce.**

To begin, as the district court explained, Samsung has formed the requisite contacts with Indiana under a straightforward application of the "stream of commerce" theory of purposeful availment, which this Court has repeatedly endorsed in products-liability cases. *See J.S.T. Corp. v. Foxconn Interconnect Tech. Ltd.*, 965 F.3d 571, 575 (7th Cir. 2020). This Court has consistently adhered to that theory in such cases because, when a product manufacturer "takes steps to reach consumers in a forum state"—even if indirectly, based on "downstream sales to consumers"—"it has created a relationship with the forum state that has special relevance to the litigation at issue," thus supporting specific jurisdiction. *Id.* at 576.

17

A few examples show the theory in action. In one case, this Court held that Illinois courts could exercise jurisdiction over products-liability claims against a Kansas fireworks manufacturer because the manufacturer sold fireworks to a Wisconsin middleman "with the knowledge that its fireworks would reach Illinois consumers in the stream of commerce." *Dehmlow v. Austin Fireworks*, 963 F.2d 941, 947 (7th Cir. 1992). In another case (also involving a fireworks explosion), jurisdiction was proper in Wisconsin because the two "primary distributors of fireworks in many states, though admittedly not in Wisconsin[,] . . . both knowingly [sold to] an interim distributor which in turn advertise[d] fireworks nationwide by advertisements." *Giotis v. Apollo of the Ozarks, Inc.*, 800 F.2d 660, 667 (7th Cir. 1986). "There is no evidence," this Court emphasized, "that the defendants were unaware of this scope of [the distributor's] sales efforts." *Id.* at 668. Similarly, a foreign manufacturer of flannel shirts could be sued in Wisconsin for selling shirts to a foreign corporation that in turn sold them to an American retailer that sold the shirts in Wisconsin. Because the retailer had an "established distribution system [that] funneled thousands of flannel shirts into its retail stores throughout the United States," and the manufacturer was "aware of that distribution system," the manufacturer was "indirectly serving and deriving economic benefits from the national retail market" and "should reasonably anticipate being subject to suit in any forum within that market where their product caused injury." *Nelson by Carson v. Park Indus., Inc.*, 717 F.2d 1120, 1126–27 (7th Cir. 1983).

Under these precedents, B.D. has established purposeful availment. He alleges that Samsung sent its lithium-ion batteries, including 18650s, into the stream of commerce "with the intent and knowledge that [they] would reach and be used by Indiana residents and consumers." SA 6. He further alleges that, as a result of this systematic conduct, Samsung's 18650 batteries "get to Indiana … on a large scale," and so "are readily available in Indiana, both as standalone batteries and in battery packs." App. 35. And he alleges that Samsung has "derived substantial revenue from the sale of [these] products in the State of Indiana." SA 6.

These allegations must be taken as true at this stage. Indeed, Samsung could have easily disputed the allegations if they were untrue—for instance, by filing an affidavit asserting that it lacked awareness that its 18650 batteries would reach Indiana and did not intend for that outcome. But it did nothing of the sort. Thus, under this Court's cases, B.D.'s allegations are sufficient to establish a prima facie case of purposeful availment at the motion-to-dismiss stage. *See Turnock v. Cope*, 816 F.2d 332, 333 (7th Cir. 1987); *accord Dilworth*, 355 So. 3d at 207 ("[F]or purposes of establishing a prima facie case sufficient to withstand summary judgment–LG Chem did not controvert the allegations of the complaint that it placed its product into the stream of commerce with the expectation that it would be sold in Mississippi.").

Although these uncontroverted allegations are enough for purposeful availment, B.D. confirmed them with evidence. This evidence shows that Samsung

19

intended to exploit the market for lithium-ion batteries, particularly 18650s, in Indiana. The company prides itself on being the "World's No. 1 Li-ion battery for power tools." According to its website, "Samsung SDI's li-ion battery cells for power tools are the most frequent purchased battery packs by major power tool companies worldwide." SA 129. In addition, Samsung sells its batteries, including 18650 batteries, to companies like Black & Decker, Milwaukee Tools, and Westinghouse for incorporation into their electronic devices. SA 133, 141, 143, 150. Those companies, in turn, ship their goods to states across the country, including Indiana, where they are widely available for sale to consumers. As a result, Samsung's lithium-ion batteries can be found in countless stores in Indiana—from Lowes to Walmart to Home Depot—sometimes even being featured in advertisements for electronic goods. SA 123, 125, 131, 133–40, 142, 146, 153, 155; *see* App. 35.

As the district court noted, these "facts fit neatly within" existing precedent. App. 35. "By selling lithium-ion batteries for incorporation into [these goods], Samsung guaranteed that its batteries would make their way to [Indiana] where [the goods] were marketed and sold" in large quantities, and Samsung does not dispute that it intended this distribution. *Lorenzen*, 569 F. Supp. 3d at 112–13. That is the opposite of the kind of "random, isolated, or fortuitous" sales that might not give rise to purposeful availment. *Ford*, 141 S. Ct. at 1025; *see J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 877-78 (2011) (explaining that "no more than four machines (the record

suggests only one []), including the machine that caused the injuries [at issue], ended up in [the forum state]," and pointing to no allegations that "reveal[ed] an intent to invoke or benefit from the protection of [the forum state's] laws"). Simply put: "The alleged facts show a continuous and deliberate exploitation of the Indiana market, and that Samsung has purposefully availed itself of the privilege of conducting business in Indiana." App. 35 (cleaned up).

> **2.    Samsung has served Indiana's market by shipping over 500,000 pounds of lithium-ion batteries to an Indiana business.**

No more is needed to establish purposeful availment, but Samsung's additional contacts with Indiana confirm that it purposefully availed itself of the privilege of conducting business in Indiana. Samsung conducted business with various companies building lithium-ion-battery-based storage systems in Indiana, ultimately working collaboratively to construct three such systems with its batteries. One project in particular resulted in Samsung's shipping Indianapolis Power & Light Company more than five hundred thousand pounds of lithium-ion batteries. These efforts likely required various communications, meetings, and written contracts between Samsung and the companies to support Indiana-based projects. These direct sales independently satisfy the purposeful availment requirement, and Samsung does not contend otherwise.

## B.    B.D.'s injuries arise out of or relate to Samsung's contacts with the state.

The second requirement of specific personal jurisdiction is that the plaintiff's claims "arise out of or relate to the defendant's contacts with the forum." *Ford*, 141 S. Ct. at 1024–25 (cleaned up). The Supreme Court announced in *Ford* that "arise out of" and "relate to" are distinct concepts: Although a claim can "arise out" of a defendant's forum contacts only if there is a causal link, a claim can "relate to" those contacts even absent causation—where, for example, "a company . . . serves a market for a product in the forum State and the product malfunctions there." *Id.* at 1026–27. That is exactly what B.D. alleges here.

### 1.    At a minimum, this lawsuit "relates to" Samsung's purposeful availment of the 18650-lithium-ion-battery market in Indiana.

As the district court spelled out, "when a defendant [in a products-liability suit] takes steps to reach consumers in a forum state, it has created a relationship with the forum state that has special relevance to the litigation at issue." App. 37 (quoting *J.S.T. Corp.*, 965 F.3d at 576). "The stream of commerce theory contemplates that a defendant's product may go through middlemen before reaching consumers, but the point of consumer sale remains relevant to the relationship between the defendant, the forum, and the consumer-injury litigation." *Id.*

Here, an Indiana resident purchased a Samsung 18650 battery in Indiana, and the battery was then used in Indiana, malfunctioned in Indiana, and caused an injury

in Indiana. This suit thus has a strong connection to Samsung's purposeful availment of the Indiana 18650-battery market—and perhaps even a causal one, as the district court held, given that it "arises from an allegedly defective battery [B.D.] bought in Indiana." App. 38. Indeed, the complaint allows for a fair inference that, had Samsung not sold any 18650 batteries to out-of-state distributors with the "intent and knowledge" that they would be sold to Indiana consumers, B.D. would not have purchased this battery, and this suit would not exist. SA 6. But at a minimum, the connection to Indiana satisfies the "relates to" requirement.

The Supreme Court's recent decision in *Ford* explains why. *Ford* involved two "products-liability suit[s] stemming from [an] accident." 141 S. Ct. at 1022. In both suits, "[t]he accident happened in the State where suit was brought," the "victim was one of the State's residents," and Ford "did substantial business in the State"—including selling the same type of product that "the suit claims is defective." *Id.* The Supreme Court held that, in this scenario, the exercise of personal jurisdiction is proper. Even if the suit couldn't be shown to "arise out of" Ford's forum-related contacts in a causal sense—because the specific products that injured the plaintiffs in that case had been originally sold "outside the forum States, with consumers later selling them to the States' residents"—the suit "relate[d] to" those contacts. *Id.* at 1026, 1029. Ford "systematically served a market in [the forum States] for the very [products] that the plaintiffs allege malfunctioned and injured them in those States."

*Id.* at 1028. "So there is a strong relationship among the defendant, the forum, and the litigation—the essential foundation of specific jurisdiction." *Id.* The Court thus held that when a company "serves a market for a product in a State and that product causes injury in the State to one of its residents, the State's courts may entertain the resulting suit." *Id.* at 1022; *see also id.* at 1027 ("[S]pecific jurisdiction attaches . . . when a company like Ford serves a market for a product in the forum State and the product malfunctions there.").

That holding controls here. This case involves a suit by an Indiana resident who bought an 18650 battery in Indiana and was injured by it in Indiana. And, as already discussed, B.D. has alleged that Samsung serves the Indiana market for lithium-ion batteries (and 18650 batteries in particular) through its business strategy of having its batteries incorporated into battery packs and various electronic devices sold throughout the state. So there is a "strong relationship" between Samsung, Indiana, and this lawsuit. As other appellate courts have recognized, that relationship falls squarely under *Ford*'s rule. *See, e.g., Dilworth*, 355 So. 3d at 209; *LG Chem, Ltd. v. Lemmerman*, 361 Ga. App. 163, 173 (2021), *cert. denied* (Mar. 8, 2022); *see also LG Chem Am., Inc. v. Morgan*, 2020 WL 7349483, at *10 (Tex. App. Dec. 15, 2020), *cert. granted* (Mar. 22, 2023).

### 2.     Samsung's lithium-ion battery shipments to an Indiana company relate to this litigation.

This suit also relates to the second way in which Samsung serves the Indiana market—its direct sale of hundreds of thousands of pounds of lithium-ion batteries for use in the state. For jurisdictional purposes, the relevant "product" here is lithium-ion batteries. *See Dilworth*, 355 So. 3d at 209 (considering "the general market . . . for lithium-ion batteries" for relatedness). That is because, as B.D. explained with evidence below, the lithium-ion batteries that Samsung shipped directly to Indiana "employ the same research, development, and battery components" as its 18650 batteries. ECF No. 16 at 6 n.12. Indeed, not only are the batteries similar in size, ECF No. 23 at 10, but Samsung's own evidence indicates that any size differences are immaterial, because the power-grid batteries are *a bunch of small cylindrical batteries* (that look identical to 18650s) with an additional prismatic encasing, SA 274.

Consistent with this understanding, Samsung's own representative has repeatedly made a similar point in other litigation, arguing that "[a]ll lithium-ion cells are the same" in that they "have a risk of explosion" when "the appropriate protection circuit is not used." SA 49; SA 57 ("It's not only Samsung's [18650] lithium-ion batteries, but all lithium-ion batteries are flammable."); SA 50 ("In the lithium-ion battery technology, when the positive and negative shorts, it could catch fire."); SA 51 ("That does not apply only to E-cigarettes, but it also applies to notebooks and all electronic devices when using the lithium-ion batteries.").

For that reason, when Samsung sold over half a million pounds of lithium-batteries to Indiana, it was on notice that it could be sued in Indiana if one of its lithium-ion batteries exploded in Indiana. After all, nobody would dispute that someone working at an Indiana power grid could sue Samsung if one of its lithium-ion batteries exploded there. Because B.D. is bringing essentially the same claim, it was entirely foreseeable that Samsung would be haled into Indiana court to defend against this kind of claim. So *Ford*'s test is satisfied in this context as well: Samsung "serves a market" for lithium-ion batteries in Indiana, and a lithium-ion battery "malfunctioned there." *Id.* at 1021–22. Hence, "specific jurisdiction attaches." *Id.* at 1027.

## II.  Samsung's two objections to personal jurisdiction both fail.

Samsung resists this straightforward application of binding precedent. It takes the position that it may not be sued in Indiana—or anywhere in the United States—on B.D.'s claims. It makes two arguments in support of that position. *First*, Samsung argues that it has "no contacts whatsoever with Indiana" because it did not directly sell or market its 18650 batteries to anyone in Indiana. *Second*, it argues that, even if it did serve the Indiana market, this suit does not relate to those contacts because the battery here was used for unauthorized purposes. Both arguments are foreclosed by precedent from this Court and the Supreme Court.

### A. Samsung's argument that it has "no contacts" with Indiana ignores this Court's stream-of-commerce precedents.

**1.** Samsung's first argument is an attack on the stream-of-commerce theory itself. Samsung asserts that it has "no contacts with Indiana"—*at all*—because it made no direct sales of 18650 batteries to anyone in Indiana and instead made only "business-to-business" sales to intermediaries outside of Indiana. Opening Br. 13–15.

But as the district court recognized, "the stream of commerce theory exists to reach upstream manufacturers that do not themselves appear in the forum." App. 35. The theory therefore specifically "contemplates that a defendant's product may go through middlemen before reaching consumers," providing jurisdiction in exactly that scenario. *J.S.T. Corp.*, 965 F.3d at 576.

Thus, in applying the stream-of-commerce theory, this Court has been clear that it "consider[s] a defendant to be subject to state court jurisdiction when the defendant sells its product 'for ultimate use' in the forum state." *Dehmlow*, 963 F.2d at 947 n.5. Nor is there a "per se requirement that the defendant especially target the forum in its business activity." *Curry*, 949 F.3d at 399. To the contrary, "it is sufficient that the defendant reasonably could foresee that its product would be sold in the forum." *Id.* Or put differently: "'[P]urposeful direction' may be shown by evidence that the defendant's actions, even if initiated outside of the forum state, nevertheless were directed at the forum state. For example, a defendant may cause its product to be distributed in the forum state." *Id.* at 398. That's why there was jurisdiction in

*Giotis*, 800 F.2d at 667, and *Nelson*, 717 F.2d at 1126, for example—even though the manufacturers there had not shipped, sold, or advertised their products in the states where they malfunctioned. *See Dehmlow*, 963 F.2d at 947 n.5 ("Although … consumers are not necessarily purchasers of [the defendant's] products, this Circuit has not considered that problematic [under the stream-of-commerce theory]."); *Gray v. Am. Radiator & Standard Sanitary Corp.*, 22 Ill. 2d 432, 442 (1961) (holding that jurisdiction was proper over an out-of-state manufacturer that sold component parts to another out-of-state business); *Mason v. F. LLI Luigi & Franco Dal Maschio Fu G.B. s.n.c.*, 832 F.2d 383, 386 (7th Cir. 1987) (reaffirming this Court's adherence to *Gray*).

Samsung resists this conclusion, seeking refuge in *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873 (2011), and *Jennings v. AC Hydraulic A/S*, 383 F.3d 546 (7th Cir. 2004). But both of these cases are easily distinguishable.

*Nicastro* involved a suit against a British manufacturer of scrap metal machines that used an independent distributor to sell its machines in the United States. 564 U.S. at 878. One of its machines eventually injured someone in New Jersey, and he sued J. McIntrye there. The plaintiff's "claim of jurisdiction center[ed] on three facts: The distributor agreed to sell J. McIntyre's machines in the United States; J. McIntyre officials attended trade shows in several States but not in New Jersey; and up to four machines ended up in New Jersey" (though the record suggested that his machine was the only one sold in the state). *Id.* at 886. On those facts, the Court held

that the plaintiff had not "established that J. McIntyre engaged in conduct purposefully directed at New Jersey." *Id.* Although four justices would have resolved the case by making broader pronouncements about the stream-of-commerce theory, *id.* at 881–87, the controlling opinion was limited to the unique facts of the case, which showed only "a single sale of [the defendant's] product in [the forum] State." *Id.* at 888–89 (Breyer, J., concurring); *see J.S.T. Corp.*, 965 F.3d at 575 (continuing to apply this Court's stream-of-commerce theory after *Nicastro*).

This case is nothing like *Nicastro*. It involves lithium-ion batteries sold in Indiana "on a large scale" by one of the world's leading lithium-ion-battery manufacturers, App. 35, which does not dispute that it intended to serve Indiana's market for lithium-ion batteries. As the district court put it: "Samsung must know that its batteries are ubiquitous in the United States, including Indiana: this is not a case of a boy flying back home from Seoul with a souvenir e-cigarette he got from a mom-and-pop sidewalk vendor; this is a case of a multinational business that directly and indirectly sells as many batteries to the United States as it can." App. 36.

*Jennings* is no more on point. The plaintiff there offered two theories for personal jurisdiction: (1) that the defendant (a company in Denmark with sparse U.S. sales) "advertised its products to consumers in the United States, including Indiana residents, by maintaining an English-translated website," and (2) that it "sold some of its products to distributors in Florida, thus placing them in the 'stream of

commerce' of the U.S. market, which includes Indiana." *Id.* at 549. This Court rejected the first theory as boundless. *Id.* at 550. As for the second theory, this Court explained that, "[i]f a defendant delivers products into a stream of commerce, originating outside the forum state, with the awareness or expectation that some of the products will be purchased in the forum state, that defendant may be subject to specific jurisdiction in the forum state." *Id.* But "[t]he bottom line" was that the plaintiff's "sparse evidence" was insufficient to make that showing. The plaintiff "produced no evidence that any of [the defendant's] products . . . were ever sold in Indiana." *Id.* at 550–51. As for third-party distributors, she did "not present any volume information for these sales or provide us with information about where the distributors resell the products, so the scope of any alleged distribution in the rest of the United States, and whether any [of the defendant's] products have been distributed in Indiana, cannot be determined." *Id.*

    Here, by contrast, Samsung does not deny that its lithium-ion batteries are sold in Indiana—and not just occasionally, but "on a large scale." App. 35. So even if Samsung never directly sold its 18650 batteries to Indiana, its batteries are so readily available in the state that, at a minimum, it can fairly be inferred that Samsung knew and intended to serve a market for lithium-ion batteries in Indiana. In fact, that is exactly what B.D.'s complaint alleges—and Samsung has never denied it.

**2.** In any event, even if direct sales were required, there *were* significant direct sales here, also unlike in *Nicastro* and *Jennings*. As already noted, B.D. submitted evidence showing that on multiple occasions in 2015, Samsung shipped huge amounts of its lithium-ion batteries to an Indiana company, which in turn used them to supply power to Indiana residents. SA 30–34, 117–19.. These sales, alongside Samsung's facilitation of two additional power-grid projects in Indiana using its lithium-ion batteries, indisputably suffice for purposeful availment. SA 121.

Samsung's only response is to assert, in the last paragraph of its brief, that these batteries are "wholly unrelated products." Opening Br. 23. But it doesn't explain how. And as B.D. has shown, in other litigation, Samsung represented that the batteries are the same in every relevant respect. Samsung's own evidence in this litigation supports that understanding. It shows that, while they have different shapes, the batteries are similar in technology and size, with the power-grid batteries appearing to be a package of cylindrical ones. *See* SA 266, 274; ECF No. 23 at 10; *compare* SA 20 (showing how 18650s are packed to create battery packs) *to* SA 268–70 (showing how Samsung's electronic-storage batteries are packed to create battery packs). Because Samsung has failed substantiate its claim that the size and shape of batteries is jurisdictionally relevant, and B.D. has submitted evidence showing that they are not, this Court should reject the company's attempt to have the case dismissed for lack of minimum contacts. *See Purdue Research Found. v. Sanofi-Synthelabo,*

31

*S.A.*, 338 F.3d 773, 782 (7th Cir. 2003) ("In evaluating whether the prima facie standard has been satisfied, the plaintiff 'is entitled to the resolution in its favor of all disputes concerning relevant facts presented in the record.'"); *Curry*, 949 F.3d at 393.

Under this Court's cases, too, Samsung's power-grid lithium-ion batteries and 18650 lithium-ion batteries are sufficiently similar to be considered the same product for jurisdictional purposes. For example, in *Dehmlow*, the relevant market was the "market for fireworks," not the market for the exact firework model that injured the plaintiff. Moreover, the Court considered that to be the relevant market even though the market for fireworks included those that the manufacturer sold to businesses (presumably for consumer sale), as well as those used for holiday displays in big cities. *See Dehmlow*, 963 F.2d at 947–48; *cf. Jennings*, 383 F.3d at 551 (pointing out that establishing whether "any other AC Hydraulic products have ever been sold" in the forum state would have assisted the plaintiff in demonstrating specific jurisdiction). So too here. Just as *Dehmlow* considered all fireworks to be the relevant market for purposes of analyzing specific jurisdiction, this Court should consider all lithium-ion batteries to be the relevant product.[1]

---

[1] *Ford* supports this approach. Although the opinion states that it does "not address" a scenario in which Ford "marketed the models [in question] in only a different State or region," not the forum state, its reasoning suggests that the product market should be understood broadly for jurisdictional purposes. *Ford*, 141 S. Ct. at 1026 In its legal analysis, for example, the Court emphasized that "automobiles" are one of Ford's "products." *Id.* at 1028. And its description of *World-Wide Volkswagen*

**B.     Samsung's attempt to avoid *Ford*'s rule based on how the consumer used the product in the state has no legal support.**

Samsung makes only one other argument against jurisdiction: that the battery here was used for unauthorized purposes. Samsung attempts to cast this as a jurisdictional problem by claiming that, even if it serves the Indiana market for lithium-ion batteries, it "had no reason to foresee that its product would end up in Indiana being misused by BD as alleged in the complaint." Opening Br. 16–17. But whether Samsung could foresee that someone might use its product in an unintended way has no bearing on the minimum-contacts analysis, as numerous courts have held. *See, e.g, Dilworth*, 355 So. 3d at 209; *Lemmerman*, 361 Ga. App. at 173; *Morgan*, 2020 WL 7349483 at *10; *Tieszen v. EBay, Inc.*, 2021 WL 4134352, at *6 (D.S.D. Sept. 10, 2021); *Williams v. LG Chem, Ltd.*, 2022 WL 873366, at *5 (E.D. Mo. Mar. 24, 2022); *Berven v. LG Chem, Ltd.*, 2019 WL 1746083, at *11 (E.D. Cal. April 18, 2019), *adopted by Berven v. L.G. Chem, Ltd.*, 2019 WL 4687080 (E.D. Cal. Sept. 26, 2019; *Sullivan v. LG Chem, Ltd.*, 2022 WL 452501, at *8 (E.D. Mich. Feb. 14, 2022). This Court should hold the same.

---

made a similar point. "[I]f Audi and Volkswagen's *business* deliberately extended into Oklahoma (among other States)," the Court stressed, "then Oklahoma's courts could hold the companies accountable for a car's catching fire there." *Id.* at 1027 (emphasis added). That's because "a company thus 'purposefully avail[ing] itself' of the Oklahoma *auto market* 'has clear notice' of its exposure in that State to suits arising from local accidents involving its cars." *Id.* (emphasis added).

Nevertheless, if this Court disagrees and considers the relevant product to be 1865os, B.D. still prevails because of Samsung's exploitation of Indiana's 18650 market through the stream of commerce.

For starters, the stream-of-commerce test—like the minimum-contacts test more broadly—doesn't focus on how a product is used once it's in the forum state. It focuses on whether the manufacturer has formed the requisite contacts with the state by causing its products to be disseminated there. Or as this Court has put it: The test focuses on whether "the defendant's distribution scheme[] landed [the product] in Indiana." *Jennings*, 383 F.3d at 551. The answer here is yes. As a result, Samsung can reasonably anticipate being haled into court in Indiana to defend against claims concerning the use of its batteries by Indiana residents in Indiana.

Nor does this argument fare any better if framed as an effort to redefine the relevant market as the "market for 18650 lithium-ion batteries cells in e-cigarette applications" (or the market for standalone use by consumers), rather than the market for lithium-ion batteries (or even for 18650 batteries). Opening Br. 15–16. Samsung provides no authority for subdividing the Indiana market in this way, nor much developed argumentation on this score at all. Nor does it specify whether its "specific-market" theory is a purposeful-availment argument or a relatedness one, apparently collapsing them into a single question of whether a company subjectively intended its product to be used in a specific manner. But even assuming that this argument has been sufficiently developed for this appeal, it fails for multiple reasons.

*First*, the argument conflicts with longstanding jurisdictional principles. If Samsung were right, someone injured in Indiana by an 18650 battery from a power

tool could sue in Indiana, but not someone injured in Indiana by an 18650 battery in an e-cigarette device. That would shift the focus of the jurisdictional inquiry from the defendant and the forum to *the plaintiff*, contrary to well-established precedent from the Supreme Court and this Court. *See, e.g.*, *Walden*, 571 U.S. at 289 (explaining that "a plaintiff's contacts with the defendant and forum [should not] drive the jurisdictional analysis"); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984) ("[The] unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction."); *J.S.T. Corp.*, 965 F.3d at 577 ("[I]t is the defendant's conduct, not the plaintiff's injury, that must form the necessary connection with the forum State.").

*Second*, Samsung's argument conflicts with *Ford*—and in more ways than one. As the district court explained, "specific personal jurisdiction comes out of a tradition requiring presence, real or effective, in the forum," and *Ford* itself indicates that its understanding of "the word 'market' still refers to geographic areas, not to specific product uses." App. 37. *See, e.g., Ford*, 141 S. Ct. at 1027 (referring to "a State's market"). That is why *Ford*'s rule is implicated whenever the defendant "serves a market for a product in a State." *Id.* at 1022.

But it's not just *Ford*'s articulation of its holding that forecloses Samsung's argument. The Supreme Court in *Ford* itself rejected a similar market-based parsing

when Ford attempted to avoid lawsuits arising from the used-car market. *Ford*, 141 S. Ct. at 1023. The plaintiffs in Ford had purchased used vehicles from a third party, rather than new vehicles from an authorized Ford dealer. So Ford could have easily argued that "[a]ny actions by a third party that result[ed] in [cars reaching the forum states] are not attributable to [Ford]," just as Samsung argues here. Opening Br. 20. And in fact, Ford made exactly that argument in its briefing to the Supreme Court. *See* Reply Br. in *Ford*, Nos. 19-368 & 19-369, at 26 n.5 (arguing that "the 'unilateral activity of another party' in selling a used vehicle to the plaintiff is not an appropriate consideration" for jurisdictional purposes). But rather than drawing a distinction between the used-car and new-car markets, or finding significance in the fact that "[o]nly later resales . . . by consumers" brought the cars into the forum states, the Court focused on the facts that mattered: Ford sold the same product in the state, and the product caused an injury in the state to a resident of the state. 141 S. Ct. at 1023. That is equally so here.

Moreover, Samsung's argument (if accepted by this Court) would inject an even more stringent causation requirement than the one rejected by the Supreme Court in *Ford*. By arguing that personal jurisdiction should dissipate upon unauthorized use of a product, Samsung could be understood as making an argument that proximate cause is lacking—in Indiana, and everywhere—because there was an intervening cause of the plaintiff's injuries. But *Ford* rejected even a laxer

but-for causal test. *See* 141 S. Ct. at 1029 (rejecting such a test as flatly "inconsistent with our caselaw"); *id.* at 1034 (Gorsuch, J., concurring) (describing the majority as rejecting a "but-for causation test," which "isn't the most demanding"). *A fortiori*, it cannot be correct that due process demands proximate causation.

At the end of the day, as the district court recognized, how Samsung claims to have intended its products to be used is irrelevant to personal jurisdiction. To the extent unauthorized use is relevant to the case at all, it goes to the merits—that is, to Samsung's potential liability—not to the power of Indiana courts to even consider the merits. *See Dilworth*, 355 So. 3d at 208 ("For a specific jurisdiction analysis, the placement of the product in the marketplace is the relevant focus, not how the injured plaintiff used the subject product."); *cf. Ford*, 141 S.Ct. at 1026 (drawing distinction between the second due-process factor for assessing personal jurisdiction and tort concepts such as but-for causation).[2]

---

[2] Although they are irrelevant to jurisdiction, we note that Samsung's proffered expectations about battery use are implausible and belied by B.D.'s evidence. Every manufacturer knows that businesses and consumers won't use their products to their exact specifications. And that's all the more so here, where the product at issue (batteries) is one of the most ubiquitous, versatile, and interchangeable products imaginable (and where Samsung concedes that it intended the products to be used across a broad array of consumer electronic devices, although not the one involved in this case). B.D also submitted evidence showing that Samsung has known since 2016 that its 18650 batteries are reaching the e-cigarette market. SA 101. So, Samsung can't credibly claim that it lacked fair warning—and particularly not when it did so little to stem the use of its batteries in the "market for e-cigarettes."

### III.   In the alternative, B.D. is entitled to jurisdictional discovery.

If this Court has any doubts about whether jurisdiction is proper, it should remand to allow B.D. to develop a record through jurisdictional discovery, as he requested below in opposing Samsung's motion to dismiss. ECF No. 16 at 15–16.

A plaintiff is entitled to jurisdictional discovery if he establishes "a colorable or prima facie showing of personal jurisdiction." *Reimer Express World Corp.*, 230 F.3d at 946. In determining whether a plaintiff has satisfied that minimal burden, this Court "consider[s] the record in its entirety and draw[s] all inferences in [the plaintiff's] favor," while bearing in mind the fact that, without discovery, "it is not surprising that [the plaintiff] can do little more than suggest that [a defendant] currently has minimum contacts." *Cent. States, Se. & Sw. Areas Pension Fund v. Phencorp Reinsurance Co.*, 440 F.3d 870, 878 (7th Cir. 2006); *see Philos Techs., Inc.*, 802 F.3d at 912.

As already explained, B.D. has established a prima facie case of jurisdiction under two independent theories. First, under a stream-of-commerce theory, he has alleged that Samsung put its 18650 batteries into the stream of commerce with the intent and knowledge that they would reach Indiana. And he supported that allegation with evidence. Samsung did not rebut this evidence, but to the extent that the Court were disinclined to credit his allegation, that is exactly what he would seek to corroborate. For instance, he could ask Samsung to provide more information

about its distribution channels, including the identity of any intermediaries in the distribution chain and communications about the locations of downstream buyers.

Second, B.D. alleged that Samsung served Indiana's market for lithium-ion batteries by shipping over half a million pounds of lithium-ion batteries to an Indiana company to supply backup power to Indiana consumers. It also provided lithium-ion batteries for two other power grids in Indiana. B.D. has argued that, although the power-grid batteries are a different model than 1865os, they should be considered the same product for purposes of specific personal jurisdiction. He supported that assertion with evidence, including statements that Samsung has made about the similarities between the batteries in depositions in other cases. Although Samsung disagrees, it has provided no reason—much less any evidence—that the differences between these batteries are jurisdictionally significant. But to the extent that "material facts about personal jurisdiction are in dispute" with respect to 1865os and power-grid batteries, B.D. should be entitled to jurisdictional discovery to aid the resolution of those facts. *Philos Techs., Inc.*, 802 F.3d at 912.

## CONCLUSION

This Court should affirm the decision of the district court.

Respectfully submitted,

*/s/ Alisa Tiwari*
ALISA TIWARI
JONATHAN E. TAYLOR

Gupta Wessler PLLC
2001 K St. NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
*alisa@guptawessler.com*

May 8, 2023                    *Counsel for Plaintiff-Appellee*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Circuit Rule 32(c) because this brief contains 9,858 words excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

*/s/ Alisa Tiwari*
Alisa Tiwari

## CERTIFICATE OF SERVICE

I hereby certify that on May 8, 2023, I electronically filed the foregoing brief and appendix with the Clerk of the Court for the U.S. Court of Appeals for the Seventh Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Jonathan E. Taylor*
Jonathan E. Taylor

## CIRCUIT RULE 30(d) STATEMENT

This brief and appendix comply with Circuit Rule 30(d) because all materials required by Cir. R. 30(a) and (b) are included in the appendix.

_/s/ Alisa Tiwari_
Alisa Tiwari